***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Ledford. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Ledford with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between plaintiff-employee and defendant-employer.
3. The employer was insured for workers' compensation coverage at all relevant times.
4. Plaintiff's average weekly wage was $495.81, with a resulting compensation rate of $330.56.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was 41 years of age. She is a high school graduate, and had been employed by defendant-employer from September 28, 1992 through October 3, 2002 as a legal secretary.
2. Defendant-employer is a law firm that specializes in patent and trademark law. Plaintiff's job as a legal secretary required a fair amount of documentation, typing, filing, performing other clerical duties, and answering the phone. According to her testimony, plaintiff spent about fifty percent (50%) of her workday typing, thirty percent (30%) of the day filing and the remaining twenty percent (20%) of the day on other clerical duties.
3. Plaintiff is left-hand dominant. Plaintiff testified that in 1997, she began to feel pain in her hands. A wrist pad was provided for her keyboard. Although she testified that she mentioned this to her general practitioner Dr. Rebecca Clemenzi, the doctor's notes contain no mention of hand complaints in 1997-98. At plaintiff's October 19, 1998 physical, Dr. Clemenzi assessed other conditions, obesity, hypertension, acid reflux (GERD), and irritable bowel, but made no mention of any hand complaints.
4. On May 14, 1999 plaintiff began treating with Dr. Lorraine Doyle, a board certified orthopedic surgeon. Plaintiff complained of one year of numbness in her hands, particularly her right hand. Upon examination, Dr. Doyle found positive Tinel's and Phalen's signs and assessed bilateral carpal tunnel syndrome. Dr. Doyle prescribed wrist splints and gave plaintiff cortisone injections in both wrists.
5. At plaintiff's visit of June 10, 1999, Dr. Doyle noted that plaintiff's complaints did not conform well to any one nerve entrapment and that these vague symptoms could also be associated with fibromyalgia, or some type of myofascial syndrome. She referred plaintiff to Dr. Terry White, a physiatrist, for physical medicine treatment, rather than proceeding with surgery at that time.
6. Plaintiff began treatment with Dr. White on July 21, 1999. At that time, Dr. White assessed her with fibromyalgia, along with carpal tunnel syndrome. He began a program of physical therapy and prescribed Ultram and Paxil, and recommended weight loss.
7. In May 2001, plaintiff was referred back to Dr. Doyle for complaints of increased "unknown pain" in her left hand. Plaintiff described explosions in her left palm, and reported that her fibromyalgia was under fairly good control with medications.
8. On December 21, 2001, Dr. Doyle performed a left carpal tunnel release. The surgery went well, and as of plaintiff's January 7, 2002 visit, Dr. Doyle noted that she would keep her out of work another week. In follow-up on February 13, 2002, Dr. Doyle found plaintiff was doing extremely well. Plaintiff returned to work about a month after the surgery.
9. On May 28, 2002, Dr. Angelo C. Cammarata performed a right carpal tunnel release on plaintiff. As of October 2, 2002, Dr. Cammarata noted that plaintiff could advance her activities as tolerated with her hands and that she would see her on an as needed basis. Following plaintiff's right carpal tunnel release, plaintiff began to receive assistance in filing from a co-employee. However, plaintiff voluntarily resigned her position on or about October 3, 2002.
10. During her deposition, Dr. Doyle opined that there was no way to predict or judge which people will develop carpal tunnel syndrome. Dr. Doyle was of the opinion that the development of carpal tunnel syndrome depends on many factors. Dr. Doyle also stated that she did not have an opinion about plaintiff's fibromyalgia.
11. Dr. Doyle further opined that any work situation that required repetitive motion within a certain period of time would probably put someone at a higher risk of developing carpal tunnel syndrome. However, thyroid disease, diabetes, and rheumatoid arthritis are risk factors for contracting carpal tunnel syndrome. Dr. Doyle also opined that all computer work is repetitive, and it depends on the length of time working, the number of breaks taken, typing speed, and how a patient holds her hands to determine what impact the work may have in the development of carpal tunnel syndrome. Contrary to plaintiff's main complaint that the filing caused her problems, Dr. Doyle did not believe that the filing involved in plaintiff's job could have caused the carpal tunnel syndrome.
12. Dr. Doyle was unable to opine to a reasonable degree of medical certainty that plaintiff's employment placed her at an increased risk of developing carpal tunnel syndrome. Likewise, Dr. Doyle was unable to opine to a reasonable degree of medical certainty that plaintiff's employment caused, significantly contributed to, or was a significant contributing factor to the development of her carpal tunnel syndrome.
13. Plaintiff first started treating with her family doctor Dr. Rebecca Clemenzi in August of 1995. Dr. Clemenzi treated plaintiff for a myriad of other complaints through October 2000. When asked whether plaintiff's job as a legal secretary was peculiar to the development of her fibromyalgia, Dr. Clemenzi stated that the development of fibromyalgia is of unknown etiology. Dr. Clemenzi also stated that she would not know whether plaintiff's fibromyalgia was caused from her job or not, and did not expect that being a legal secretary would cause fibromyalgia.
14. Dr. Blair Holl, an internal medicine specialist, became plaintiff's primary care physician around June 2002. Dr. Holl treated plaintiff for edema and obstructive sleep apnea, both of which may decrease energy and lead to tiredness. This explains plaintiff's testimony about getting sleepy at work. Dr. Holl did not treat plaintiff for her fibromyalgia, but left that with Dr. White.
15. Dr. Terry White testified in this matter as to his opinion regarding plaintiff's fibromyalgia and carpal tunnel syndrome. Dr. White defined "fibromyalgia" as a pain disorder that is considered to be neuropathic in nature. Dr. White defined "carpal tunnel syndrome" as a disorder that is caused by irritation of the median nerve at the wrist.
16. Dr. White stated his opinion that plaintiff's carpal tunnel syndrome and myofascial pain were attributed to plaintiff's occupation. Dr. White noted that plaintiff's pain worsened with activity and lessened with inactivity. When asked if there was a link between the carpal tunnel syndrome and the fibromyalgia, Dr. White stated, "The carpal tunnel syndrome seemed to have preceded development of her fibromyalgia with her. And since fibromyalgia is thought to be consistent with the development of a chronic pain, it seemed most likely that the carpal tunnel contributed to the development of the fibromyalgia." Dr. White did admit that plaintiff's occupation did not seem to be predictive for the development of fibromyalgia.
17. Dr. White offered no opinion on whether plaintiff's employment caused, significantly contributed to, or was a significant contributing factor in the development of plaintiff's carpal tunnel syndrome or fibromyalgia. Dr. White's testimony indicates only that in his opinion, plaintiff's employment "aggravated" her carpal tunnel syndrome.
18. While there may be some evidence, primarily from Dr. White, that plaintiff's position as a legal secretary may have placed her at an increased risk of developing carpal tunnel syndrome as compared to the general population not so employed, there is no evidence that plaintiff's employment caused, significantly contributed to, or was a significant contributing factor to the development of her carpal tunnel syndrome.
19. In weighing the evidence, the undersigned gives greater weight to the testimony of Dr. Doyle, who is an orthopaedic and hand specialist, than to the testimony of Dr. White, a physiatrist. The undersigned find that the greater weight of the credible evidence fails to show a causal link between plaintiff's employment and the development of her carpal tunnel syndrome and her fibromyalgia, and fails to show a causal link between plaintiff's carpal tunnel syndrome and her fibromyalgia.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff has failed to prove that her carpal tunnel syndrome is causally linked to her employment. N.C. Gen. Stat. § 97-53(13).
2. Plaintiff has failed to prove that that plaintiff's employment placed her at an increased risk of developing fibromyalgia as compared to the general public not so employed. Plaintiff has failed to carry her burden of proving a causal connection between her fibromyalgia and her employment. N.C. Gen. Stat. § 97-53(13); Young v. Hickory Bus. Furn., 353 N.C. 227,538 S.E.2d 912 (2000).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Under the law, plaintiff's claim must be, and is, hereby DENIED.
2. Each party shall bear their own costs, except that defendants are responsible for all expert witness fees previously approved.
This the 29th day of August, 2005.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER